ABA DISTRIBUTORS, INC., Plaintiff,

v.

ADOLPH COORS COMPANY,
Defendant.

No. 80–0298–CV–W–1.

United States District Court,
W. D. Missouri, W. D.

July 6, 1982.

See also D.C., 505 F.Supp. 831.

Harry P. Thomson, Jr., Shughart, Thomson & Kilroy, Kansas City, Mo., for plaintiff.

Kent E. Whittaker, Hillix, Brewer, Hoffhaus & Whittaker, Kansas City, Mo., Leo N. Bradley, Bradley, Campbell & Carney, Golden, Colo., for defendant.

## MEMORANDUM OPINION, FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDERS

JOHN W. OLIVER, Senior District Judge.

### I. *Introduction*

This case is before us a second time. The first time the case was considered, this Court granted preliminary injunctive relief. See *ABA Distributors, Inc. v. Adolph Coors Co.,* 496 F.Supp. 1194 (W.D.Mo.1980). On appeal, the Eighth Circuit in *ABA Distributors, Inc. v. Adolph Coors Co.,* 661 F.2d 712 (8th Cir. 1981), dissolved the preliminary injunction granted and remanded the case to this Court suggesting that the parties and Court expedite trial on the merits.

In accordance with that implicit direction of the Court of Appeals, the parties eventually entered into a stipulation in which they agreed that plaintiff's claim for permanent injunctive relief should be presented for this Court's determination on the merits in accordance with procedures agreeable to the parties and approved by the Court. The procedures agreed upon in the stipulation of the parties provided that:

1. The case as above defined is hereby submitted to the Court for its decision on the merits on the basis of all the evidence adduced by the parties in support of and in opposition to plaintiff's motion for a temporary restraining order and plaintiff's motion for a preliminary injunction, together with the following additional evidentiary data:

(a) Abe Gustin will testify, either in person or by affidavit, that should the notice of March 21, 1980 be set aside, ABA could resume its operation of the distributorship immediately....[1]

(b) Abe Gustin will testify, either in person or by affidavit, that should the termination notice of March 21, 1980 be set aside, there are several qualified, financially sound, potential purchasers for ABA's distributorship....[2]

1. The parties stipulated that Abe Gustin's detailed testimony would be as follows:

Specifically he [Abe Gustin] will testify that:

(1) Abe Gustin, Bill George and Alex George will be ready to resume their executive positions immediately;

(2) Ed Budde, Sales Manager, is still on ABA's payroll, and is available immediately;

(3) Elke Crouss, Office Manager, is still on ABA's payroll, and is available immediately;

(4) Todd Buford, Warehouse Foreman, is still on ABA's payroll, and is available immediately;

(5) Supervisor Nick Charmello is currently with Southside Distributors, and is immediately available; Supervisors Lu Charmello, Mark Leibel and Tony Orlando have expressed a desire and willingness to work for ABA, and would be promptly available;

(6) Of the eight driver-salesmen, three are currently with Southside and, therefore, are immediately available; four others have expressed a desire and willingness to work for ABA, and would be promptly available;

(7) ABA still has the warehouse under lease to ABA, with an option to extend the lease for 5 years available to ABA;

(8) ABA still owns eight beer trucks, one spare truck, two forklifts, one van, two hicube vans, computer (hardware and software), draft beer equipment, invoices, stationery, etc.

2. The parties have stipulated that Abe Gustin's detailed testimony in regard to this portion of the stipulation would be as follows:

Specifically he [Abe Gustin] will testify that:

(c) Defendant Coors will submit the deposition of William Cox.

2. The parties recognize that defendant Coors contends that Coors may justify its asserted termination of the ABA/Coors Agreement by proving, through subsequently discovered evidence, that dishonesty or violation of state and federal law by ABA existed at the time of termination (March 21, 1980), even though such evidence was not known to Coors on that date. Specifically, defendant Coors states that it believes that the evidence recited in Exhibit A, attached hereto,[3] should be admitted in evidence in determining the questions presented as stated in paragraph 5 below.

3. The parties recognize that plaintiff ABA objects to the evidence outlined in Exhibit A, and contends that the evidence set forth in Exhibit A is not admissible in evidence under applicable law.

Further, ABA does not admit the facts alleged in Exhibit A.

4. The parties agree that the Court should and will consider the question of evidence stated in paragraphs 2 and 3 above as the first question for decision. The parties further agree that in the event the Court concludes that plaintiff's objection to the evidence outlined in Exhibit A should be sustained, the Court shall proceed to determine the merits of plaintiff's claim for permanent injunction on the basis of the evidentiary data stated in paragraph 1 above.

In the event the Court concludes that plaintiff ABA's objection to the evidence outlined in Exhibit A should be overruled, the Court shall immediately set the case for further discovery (if not completed), and a hearing in order to afford defendant Coors an opportunity to adduce the additional evidence outlined in Exhibit A

---

(1) The proposed contract between Lee Shaw and ABA would be submitted immediately to Coors for its approval, together with a completed Application from Shaw, extended through April 1, 1982, at a reduced purchase price (due primarily to depreciation of assets since the date of the earlier Shaw contract).

(2) Ken Lewis, local Buick dealer, would agree to submit a proposed contract for the purchase of ABA on the same conditions and terms as contained in the Shaw contract.

(3) Dr. Lillard Ashley, Jr., (M.D.) has indicated that he would agree to the terms and conditions of the Shaw contract.

(4) Randy Caesar (Olympia Beer employee) and Sam Montosanto (Hamm's Olympia wholesaler) have indicated an interest in negotiating for the purchase of the distributorship. A price which they have mentioned would be acceptable to ABA, under certain circumstances.

(5) Richard Hutchins (a Minneapolis, Minn. investor) and Roger Oppenheimer (Kansas City) have indicated a willingness to accept the terms and conditions of the Shaw contract if they were allowed to purchase the distributorship.

(6) Robert Gourley (Southside Distributors) has indicated a willingness to negotiate for the purchase of the distributorship. Gourley is currently a Coors distributor, and is currently servicing a large part of ABA's territory.

3. Exhibit A, which reflects Coors' contentions in regard to subsequently discovered evidence, together with the footnoted statement append-

ed thereto, was attached to the stipulation and reads as follows:

*Exhibit A* *

1. Distillers Marketing was reselling into "eastern markets" beer which Distillers purchased from ABA.

2. ABA knew the identity and location of customers to whom Distillers was selling beer.

3. Distillers in conjunction with ABA prepared documents which showed that Milgram's and others, rather than Distillers, purchased beer from ABA.

4. ABA knew that such documents were prepared to reflect that someone other than Distillers purchased such beer.

5. Statewide Distributors of Kentucky and other purchasers located east of Missouri purchased beer from Distillers.

6. Statewide and others had direct contact or discussions with ABA regarding such purchasers.

7. All or part of the beer purchased by Statewide and such others from Distillers was delivered directly to trucks operated by or for such purchasers from ABA's warehouse.

* Plaintiff ABA does not admit the truth of any of the following statements. Plaintiff ABA objects to the relevance and materiality of any "after-acquired" knowledge. Further, ABA states that, even if true and admitted into evidence, the following facts do not constitute "dishonesty" or proof of "violation of federal or state law," and thus do not constitute grounds upon which Coors can rely in its purported termination of the distributorship agreement.

attached hereto and to afford plaintiff ABA a like opportunity to cross-examine defendant Coors' witnesses and to adduce any additional rebuttal evidence under the circumstances. The Court will promptly set a discovery schedule, if such discovery has not been completed.

Although the parties stated in paragraph 5 of the stipulation that they were "unable to agree on the questions of law to be presented to the Court for its determination," it is clear that the parties' stated disagreement was more apparent than real. As will be later developed in detail, the parties are in full agreement in regard to the substance of the controlling questions of law presented for decision under the procedures provided in the stipulation; their disagreement relates only to the form and the manner of how those questions should be stated. Paragraph 5 of the stipulation therefore included nine questions of law which ABA submitted for determination,[4] and five questions of law which Coors submitted for determination in the same paragraph.[5]

Paragraph 6 of the stipulation established an agreed time schedule under which proposed findings of fact, proposed conclusions of law and briefs in support and in opposition were to be filed. Paragraph 7 contained the important agreement of the parties that "the parties agree that, except as above stated, neither side wishes to adduce any additional evidence and that all disputed questions of fact shall be decided on the evidence as above stipulated."

The parties are in complete agreement that the first question of law which this Court should decide is "whether the March 21, 1980 notice of termination may be supported by subsequently discovered evidence." The language in which that ques-

---

4. The questions of law submitted by ABA in paragraph 5 of the stipulation are as follows:

Plaintiff ABA submits the following questions of law to the Court for its determination:

(a) Whether Coors wrongfully terminated the Agreement with ABA by breaching the Agreement;

(b) Whether Coors wrongfully terminated the Agreement under R.S.Mo. §§ 407.400 et seq.;

(c) If the Court's determination with respect to either question (a) or (b) above is affirmative, whether ABA is entitled to have the notice of termination set aside;

(d) If the March 21, 1980 notice of termination is set aside, whether ABA has the right to sell the distributorship;

(e) If the notice of termination is set aside, and ABA has the right to sell the distributorship, whether Coors can unreasonably withhold approval of a proposed sale;

(f) Whether ABA is entitled to an order indicating the proper means by which Coors could terminate ABA, if the March 21, 1980 notice of termination is set aside.

(g) Whether the March 21, 1980 notice of termination may be supported by subsequently discovered evidence, not known by Coors at the time of termination. Plaintiff agrees that this question should be considered first.

(h) Whether R.S.Mo. §§ 407.400 et seq. is applicable to a beer distributorship.

(i) Whether ABA's loss of its right to sell its distributorship may be adequately remedied by an award of damages.

5. The questions of law submitted by Coors in paragraph 5 of the stipulation are as follows:

Defendant Coors submits the following questions of law to the Court for its determination:

(a) Whether the March 21, 1980 notice of termination may be supported by subsequently discovered evidence, not known by Coors at the time of termination, but demonstrating the existence of adequate cause for such termination. Defendant proposes that this question should be considered first.

(b) Whether it is a violation of applicable law for a beer distributor to knowingly record, or allow others to record on its behalf, sales of beer to one purchaser as if they had been sold to another.

(c) Whether the issuance of the requested permanent injunction would have the effect of inappropriately extending to ABA the benefits of a distributorship beyond the times described in the distributorship agreement or guaranteed by R.S.Mo. § 407.405.

(d) Whether R.S.Mo. § 407.405 is applicable to a beer distributorship and, if so, whether the requirement for a 90 day termination notice actually invalidates a termination notice in disregard thereof, or merely entitles the terminated party to recover, as damages, the loss incurred by the failure to provide such notice.

(e) Whether ABA's loss of its right to sell its distributorship may be adequately remedied by an award of damages, and is thus not irreparable injury.

tion of law is stated illustrates the real agreement of the parties in regard to the substance of the legal question presented for determination. The language in which the legal question is stated is quoted from the question of law submitted by ABA in its subparagraph (g), contained in paragraph 5 of the stipulation. Coors, in its subparagraph (a) of paragraph 5 of the stipulation, used exactly the same language to submit the legal question which it proposed should be considered first by this Court. Coors, however, in its separate submission of the identical question of law submitted by ABA, did no more than add a clause to the language submitted by ABA in order that Coors could include its factual argument that the "subsequently discovered evidence," in fact demonstrated "the existence of adequate cause for such termination."

In part III of this memorandum opinion, we shall state the reasons why we have concluded that the March 21, 1980 notice of termination may *not* be supported by subsequently discovered evidence. In light of that conclusion, it is apparent that the material factual circumstances relating to our determination of the legal questions presented are not in dispute. We will state our findings of fact in the next part of this opinion and will then consider and decide the legal questions submitted by the parties.[6]

## II. Findings of Fact [7]

1. Plaintiff ABA distributors, Inc. (ABA) is a Missouri corporation with its principal place of business at 1909 Vernon Street, North Kansas City, Clay County, Missouri.

2. Defendant Adolph Coors Company (Coors) is a Colorado corporation engaged in the business of brewing and selling Coors beer products from its brewery in Golden, Colorado. Coors transacts business and enters into contracts in the Western District of Missouri.

3. ABA has been authorized to do and was doing business in the State of Missouri as a distributor of Coors beer products.

4. Service of process has been properly made upon Coors in Golden, Colorado.

5. From June 1, 1978 to March 21, 1980 Coors had no distributors nor did Coors sell beer in any states east of the Mississippi River.

6. When Coors sells its beer products to a distributor, it parts with title and domin-

---

**6.** A review of the conclusions of law proposed by the parties and a review of the respective briefs submitted in support and in opposition of those proposed conclusions show that neither side precisely keyed their proposed conclusions of law or their respective briefs to the questions of law which each party submitted in paragraph 5 of the stipulation.

Our discussion of legal questions submitted in the stipulation will, however, deal directly with various of the conclusions of law proposed by both parties as well as the legal questions submitted in the stipulation in order that the rationale of this Court's view of the applicable law will be apparent for probable further appellate review.

**7.** Some, but certainly not all, of our findings of fact are adopted verbatim from findings proposed by counsel, *but only as those findings have been agreed to be accurate* by opposing counsel. Some of the particular findings proposed by counsel were only partially admitted by opposing counsel. In those instances we have made our own finding by modification of the particular proposed finding to reflect only the portion of a proposed finding to which opposing counsel agreed. In still other instanc-

es, we have made particular findings of facts on the basis of our independent review of the evidentiary data.

It is thus clear that the procedures under which some verbatim adoption of proposed findings was made reflect what is the substantial equivalent of stipulated factual data and thus do not present the problems of verbatim adoption of winning counsels' proposed findings, recently discussed by the Court of Appeals in Part II of *Askew v. United States and the Internal Revenue Service*, 680 F.2d 1206 (8 Cir. 1982).

Paragraphs 1 through 60 of our findings of fact generally reflect our consideration of the 98 findings of fact proposed by ABA. Paragraphs 61 through 66 of our findings reflect our consideration of the 63 findings proposed by Coors. We have, of course, made a number of findings which were not proposed by either side. We have also made a number of findings of fact which are based on evidence subsequently discovered by Coors, as that evidence is identified in paragraph 1 of the stipulation, in order that those findings of fact will be available for probable appellate review.

ion over those products. Its contract with that distributor contains certain requirements (quality control), thereafter applicable to the beer.

7. On or about June 1, 1978 ABA and Coors entered into an agreement whereby ABA was appointed a distributor of Coors beer products to resell Coors beer products in a specified geographical area described in said agreement.

8. The specified geographical area described in the agreement included the Kansas City metropolitan area north of 31st Street in Jackson County, Clay County, Platte County and Ray County.

9. Sector Distributing Company, Inc., is the Coors' distributor immediately to the north of ABA's geographical area.

10. Southside Distributing, Inc. is the Coors' distributor immediately to the south of ABA's geographical area.

11. In order to obtain the agreement with Coors, ABA was required to have available approximately $1.4 million dollars, which money was made available by ABA and was expended for capital investments, trucks and equipment, the leasing of warehouse space, and the establishment of accounts and clientele.

12. ABA has expended time and effort promoting Coors beer products.

13. ABA has developed a successful and ongoing business in its territory, and has established successful and ongoing business relationships with its customers and potential customers.

14. In January, 1979 Abe Gustin, President of ABA, was called to Golden, Colorado for a meeting of several Coors distributors and Coors officials.

15. At that meeting, the group of distributors was informed that Coors believed that these distributors were selling Coors beer products outside of the geographical areas defined in their agreements.

16. Abe Gustin, in a private meeting with Coors officials during January, 1979, informed Coors officials that he was not selling Coors beer products outside of

ABA's geographical area and stated that Milgrams, a large retailer served by ABA, might be reselling beer outside of the geographical area.

17. In January, 1980 Abe Gustin was called to Golden, Colorado for a meeting with Coors officials who informed him that they believed that ABA was making sales of Coors beer products outside of ABA's geographical area.

18. Abe Gustin informed Coors officials that ABA was making no direct sales outside of its geographical area, and that ABA was selling Coors beer only to licensed accounts in ABA's geographical area.

19. Abe Gustin told Coors representatives at a January, 1979 conference and again at a January, 1980 conference that ABA had only sold beer to licensed accounts in its assigned geographical area.

20. In March, 1980, a Coors distributors' conference was held in Phoenix, Arizona, at which Peter Coors made a speech to a group of distributors at one session.

21. Peter Coors announced to the group of distributors at the Coors distributors' conference that immediate termination without notice to any distributor would result if Coors discovered that any Coors distributor was selling Coors beer outside of the geographical area contained in that distributor's agreement.

22. No evidence was adduced that Coors ever sent any written notice or any other written information to its distributors describing the policy change which had been orally announced by Peter Coors at the Phoenix meeting in early March, 1980.

23. No representative of ABA attended the session during which Peter Coors made his speech.

24. The only manner in which Coors' distributors were ever informed of the policy change was orally by Peter Coors' speech at the Phoenix meeting in early March, 1980.

25. ABA did not, in fact, receive any notice, either oral or written, announcing that a distributorship would be terminated

immediately without notice upon Coors' discovering that a distributor was selling Coors beer products outside of the distributor's geographical area.

26. Beginning February 23, 1979 until March 8, 1980, Coors hired Paul G. Corbett, a private investigator, to maintain surveillance on ABA's warehouse.

27. Corbett was instructed to report to Coors any beer deliveries or pickups which appeared to be "out of the ordinary."

28. The surveillance was conducted by Corbett and others employed by him.

29. On March 8, 1980 Corbett telephoned Leo Bradley, Coors' counsel, and informed Bradley that Corbett had observed three "bobtail" trucks leaving the ABA warehouse and delivering beer to be loaded onto a semi-trailer truck several blocks away.

30. No written report was submitted at that time to Leo Bradley.

31. No further investigation or inquiry was conducted by Mr. Corbett or others in his employ.

32. Corbett made no inquiries at ABA about this delivery.

33. Corbett did not follow or attempt to ascertain the destination of the semi-trailer truck.

34. No other investigation of ABA was ever conducted by any Coors official or person employed by Coors prior to the March 21, 1980 notice of termination.

35. On March 19, 1980, Abe Gustin was called to Golden, Colorado and informed by Coors officials that the agreement between Coors and ABA was terminated, and that ABA could no longer be a distributor of Coors beer products.

36. At the March 19, 1980 meeting, Coors did not charge that ABA had sold Coors beer out of state but did charge that ABA had been dishonest with regard to out-of-state sales.

37. Coors officials informed Abe Gustin that he would not be permitted to sell ABA to anyone.

38. Coors officials called representatives of Sector Distributing Company and Southside Distributing, Inc. and requested that they come to Golden, Colorado for a meeting on March 19, 1980.

39. After Abe Gustin's March 19, 1980 meeting with Coors officials, at which he was informed that ABA would be terminated as a distributor, Coors officials then met with the representatives of Sector and Southside and informed them that ABA's geographical market area would be temporarily divided between them.

40. On March 21, 1980 a written letter of termination was delivered from Coors to ABA to be effective on March 21, 1980.[8] Although the first paragraph of the March 21, 1980 letter stated that ABA had been "terminated" at the March 19, 1980 meeting, the parties have proceeded on the basis that Coors purported to act pursuant to

8. The letter of March 21, 1980 on the letterhead of Adolph Coors Company, Golden, Colorado, stated:

Mr. Abe Gustin
President
A.B.A. Distributors, Inc.
1909 Vernon Street
North Kansas City, MO 64116
Dear Mr. Gustin:
This letter will confirm our meeting on March 19, 1980 in which you were terminated as a Coors beer distributor effective at the close of business Friday, March 21, 1980.
Our reasons for this action were discussed with you and your counsel on Wednesday and I will not restate those. Primary among those reasons, however, was your dishonesty with us concerning deliveries and sales for resale outside of Missouri. Also, we also believe that as a consequence of those sales you are in violation of state and federal law. We have sales personnel in Kansas City prepared to work with you so that final settlement of accounts and immediate arrangements for distribution to your accounts can be completed in an orderly and timely manner. Your cooperation would, of course, be appreciated.
Very truly yours,
/S/ Melvin E. Linn
Melvin E. Linn
Vice President
Regional Sales
CC: Mr. Leo Bradley

Paragraph II(1) of the Agreement when it terminated ABA without notice, effective March 21, 1980.[9]

41. The termination letter was signed by Melvin Linn, Vice President of Regional Sales of Coors.

42. Melvin Linn had not read the investigative report by Paul Corbett prior to terminating ABA.

43. Paul Corbett had made an oral report to Leo Bradley, who then reported the conversation to Melvin Linn.

44. Linn relied upon the representations by Leo Bradley, Coors' counsel, in terminating ABA.

45. Neither Melvin Linn nor any other Coors official conducted any additional investigation of the ABA distributorship other than that contained in the Corbett report prior to notice of termination.

46. Melvin Linn did not draft the letter of termination which Coors sent to ABA.

47. Melvin Linn signed the letter of termination to ABA without questioning its contents.

48. Coors has never given ABA any notice of termination under either subparagraph (1) or subparagraph (2) of Paragraph IX of the Agreement between Coors and ABA.[10]

49. Coors never served ABA with any written notice of termination prior to the notice of termination contained in the March 21, 1980 letter.

50. At the time Coors wrote ABA on March 21, 1980, neither Melvin Linn nor any other Coors official had any actual knowledge that ABA was "in violation of state and federal law," as stated in that letter.

51. At the time Coors wrote ABA on March 21, 1980, neither Melvin Linn nor any other Coors official had any actual knowledge of any "dishonesty" by ABA with Coors "concerning deliveries and sales for resale outside of Missouri."

9. Paragraph II(1) of the Agreement provides the following:

> The Distributor shall aggressively solicit and service every retail account in the Market Description, and shall use its best efforts to promote the sale and to protect the quality of Coors beer products. The performance of the Distributor pursuant to this Agreement shall be to the satisfaction of Coors as it in its sole discretion shall determine. The Distributor agrees:
> (1) At all times to be aware of and adhere to all local, state, and Federal laws and regulations applicable to Distributor's business pursuant to this Agreement. *Violation of said laws and regulations, dishonesty,* conduct involving moral turpitude, conviction of a felony, infamous crime, or any Federal crime which is punishable in a Federal penitentiary, revocation, nonrenewal or suspension of Distributor's federal, state or local license or permit, *all shall be causes for immediate termination of Distributor at the option of Coors.* In such event, Coors shall have the right to make whatever immediate arrangements it deems necessary or expedient to provide for the sale and distribution of Coors beer products in Distributor's area. Any insolvency of Distributor, institution of proceedings in bankruptcy by or against Distributor, receivership or dissolution of Distributor, assignment for benefit of creditors pursuant to insolvency or liquidation by Distributor, shall also be cause for such immediate termination by Coors. (Emphasis ours)

10. Paragraph IX of the Agreement, which provides for the giving of notice in all instances except as provided in Paragraph II(1), reads as follows:

### IX
### TERMINATION

(1) This Agreement may be terminated by either party by the service upon the other party of at least 30 days advance written notice of termination.

(2) If Coors shall determine that Distributor has breached or is in default of any term or condition of this Agreement, then Coors shall so notify Distributor in writing specifying the grounds constituting such breach or default. Thereupon, except as provided in Paragraph II(1) herein, Distributor shall have a period of time, not more than 90 days from receipt of such notice by Distributor, within which to correct such breach or default to Coors' satisfaction. In the event that Distributor shall fail or refuse to correct such breach or default to Coors' satisfaction within the said time period, or as the same may be extended by Coors at its discretion, Coors shall have the right to terminate the Distributor.

(3) If notice of termination is served, Coors shall have the right to refuse to supply beer to the Distributor after the mailing of such notice of termination by either party.

52. The agreement between ABA and Coors did not provide for termination without notice for sales by ABA outside of its geographical area.

53. During the time Mr. Kotulic served as Coors' area manager in ABA's territory, he believed ABA was performing well and he never forwarded any written complaint or criticism of ABA to Coors.

54. Mr. Kotulic was present and operating as a Coors' representative in ABA's market territory for approximately a year and one-half prior to March 21, 1980.

55. Coors' representative Kotulic did not know of any shipment of beer by ABA to eastern accounts.

56. Approval of the *ex parte* termination of ABA by Coors would result in the destruction of ABA's business.

57. Approval of the *ex parte* termination of ABA by Coors would result in loss of all profits to ABA.

58. Approval of the *ex parte* termination of ABA by Coors has and would result in loss of all goodwill to ABA.

59. Approval of the *ex parte* termination of ABA by Coors would result in loss of capital investments by ABA.

60. Approval of the *ex parte* termination of ABA by Coors could eliminate any possibility that ABA could recoup its capital investment.

61. Coors' proposed findings of fact Nos. 6 and 7 establish that "prior to January, 1979" Coors merely "*suspected* that ABA was involved in the sale of beer to eastern markets without compliance with the quality control requirements of the distributorship agreement," and that "[t]hat *suspicion* was at least in part based upon testimony that someone in Washington, D.C. was purchasing Coors beer from Distillers Marketing, and Distillers Marketing was located

within the ABA territory." (emphasis ours). In like manner, Coors' proposed findings of fact Nos. 8, 9, 11, and 12 each reflect that "from January, 1979 to January, 1980" Coors "became *additionally suspicious*;" that in "both January of 1979 and January of 1980," ABA was "told of Coors' above mentioned suspicions;" and that "subsequent to January, 1980 Coors became *additionally suspicious* that ABA was involved in the sales of Coors beer in eastern foreign markets, without compliance with the quality control requirements of the distributorship agreement." (emphasis ours).

Coors concedes in its proposed findings of fact Nos. 13 and 14 that "Coors employed Paul Corbett," (see finding of fact No. 26 above) "as a result of those *suspicions*" and that "[s]pecifically included in Coors' *suspicions* of ABA's activities was its role, in conjunction with Distillers Marketing, in the sale of Coors beer in eastern markets." (emphasis ours).

62. Coors made no request to inspect ABA's distributor's operations concerning Coors beer, including an inspection of all of ABA's books and records, in accordance with Paragraph II (14) of the Agreement to determine whether its suspicions were or were not well founded.[11] Nor did Coors serve ABA with any notice, as required by Paragraph IX(2) of the Agreement, that Coors had determined that ABA had breached or was in default of any term or condition of the Agreement.[12]

Rather, as Coors' proposed findings of Fact No. 20 establishes, Coors elected to act pursuant to Paragraph II(1) of the Agreement[13] and to serve ABA with the March 21, 1980 *ex parte* termination letter which, as that proposed finding of fact states, was "predicated on ABA's [alleged] dishonesty

---

**11.** Paragraph II(14) of the Agreement provides:
The Distributor agrees: . . .
To permit Coors' Area Representatives or other personnel to inspect all phases of Distributor's operations concerning Coors beer, including all books and records, at such times as are mutually convenient to the Representative or other personnel and the Distributor.

**12.** Paragraph IX(2) of the Agreement is set forth in footnote 10 above.

**13.** Paragraph II(1) of the Agreement is set forth in footnote 9 above.

with Coors in connection with sales of Coors beer in eastern markets, and *the possibility* that such sales might constitute violations of state or federal law." (emphasis ours.)

63. The factual circumstances concerning Distillers Marketing establish that:

(a) By August 22, 1978 ABA had begun selling Coors beer to Distillers Marketing;

(b) Distillers Marketing is a liquor and beer wholesaler located in North Kansas City, Missouri;

(c) The sale of Coors beer from ABA to Distillers Marketing continued from August, 1978 into March, 1980;

(d) Between August of 1978 and March 21, 1980, ABA made a substantial number of sales to Distillers Marketing;

(e) In connection with some of such sales to Distillers Marketing, Mr. Gustin prepared Double A invoices reflecting sales to Distillers Marketing and concurrently prepared ABA invoices. The latter ABA invoices were prepared for bookkeeping purposes in order to put Coors on notice of the interrelationship between Bill Oberbeck of Milgram's and Distillers Marketing;

(f) Mr. Gustin wrote the number of the Missouri liquor license of the Milgram's retail store on some of the invoices to which the invoice was addressed and some of the invoices addressed to Milgram's were sent to Distillers Marketing, where a stamp and signature were affixed to them. None of the persons whose signatures were affixed to the invoices were employed by Milgram's;

(g) Some of the Coors beer sold by ABA to Distillers Marketing was physically loaded by ABA employees onto trucks designated by Distillers Marketing and on some occasions when ABA employees loaded beer on trucks designated by Distillers Marketing, ABA employees were handed checks made payable to Distillers Marketing. All such checks received by ABA employees were delivered to Distillers Marketing;

(h) When asked whether ABA had any knowledge of the sale of Coors beer in eastern markets, Mr. Gustin explained to Coors representatives about the interrelationship between Milgram's, Distillers Marketing, and Bill Oberbeck. Indeed, Mr. Gustin told Coors officials that he suspected Distillers Marketing of selling Coors beer in eastern markets; that Distillers Marketing was closely interrelated with Mr. Bill Oberbeck of Milgram's; that Milgram's had stores in the territories of several Coors distributors in addition to ABA; and that all of the Coors beer being sold by Distillers Marketing might not necessarily be coming from ABA; and that

(i) Some of the sales of Coors beer from ABA to Distillers Marketing were billed to Distillers Marketing on invoices of AA Beverage Sales and duplicate bookkeeping invoices were prepared reflecting that beer sales were billed to Milgram's. The reports prepared by ABA and submitted by it to Coors, as distinguished from ABA's books and records, did not include sales made to Distillers Marketing.

64. We reject all of Coors' proposed findings of fact which we have not thus far made as proposed or as we have modified particular findings of fact proposed by Coors, for the reason those proposed findings are clearly based on subsequently discovered evidence within the meaning of the stipulation. Examination of the findings of fact proposed by Coors which we have rejected shows that Coors, in support of its proposed findings of fact, relied either on the deposition testimony of William Cox, taken June 8, 1981, upon document inspection made after March 20, 1980, or upon depositions or hearing testimony taken long after Coors sent ABA its March 21, 1980 *ex parte* termination letter.

We also expressly find that even if all of the data cited and relied upon by Coors is

considered to be admissible, such evidentiary data is not sufficient to support an *ex parte* termination pursuant to Paragraph II(1) of the Agreement, in that such data neither established "dishonesty" nor a "violation of [any] local, state, and federal laws and regulations applicable to Distributor's business." [14]

65. The Agreement contains three separate provisions for termination. In the event a distributor is properly terminated *ex parte* for cause under Paragraph II(1), such a distributor has no further rights under the Agreement. In the event, however, a distributor is terminated on either the 30 day notice provided in Paragraph IX(1) or the 90 day notice provided in Paragraph IX(2), such a distributor is entitled to a number of substantial rights under the Agreement.

66. Coors did not act in good faith and violated its duty of fair dealing when it attempted its *ex parte* termination of ABA under Paragraph II(1) under circumstances which establish that Coors did not exercise its right of inspection and under circumstances which establish that Coors did not have actual knowledge of any dishonesty on the part of ABA or any actual knowledge that ABA was in violation of any state or any federal law.

### III. *Conclusions of Law*

■ It is to be recalled, as we noted at the end of Part I of this memorandum opinion, that the parties stipulated that the first question of law this Court should consider and decide was "whether the March 21, 1980 notice of termination may be supported by subsequently discovered evidence, not known by Coors at the time of termination." The parties recognized in paragraph 2 of their stipulation that "Coors contends that Coors may justify its asserted termination of the ABA/Coors Agreement by proving, through subsequently discovered evidence, that dishonesty or violation of state and federal law by ABA existed at the time of termination (March 21, 1980), even though such evidence was not known to Coors on that date."

The specific contention made by Coors was spelled out in paragraph 2 of the stipulation which stated that "Coors states that it believes that the evidence recited in Exhibit A [attached to the stipulation and set forth in footnote 3 above] should be admitted in evidence in determining the questions presented as stated in paragraph 5 below." [15]

Paragraph 3 of the stipulation states that "ABA objects to the evidence outlined in Exhibit A, and contends that the evidence set forth in Exhibit A is not admissible in evidence under applicable law." Paragraph 4 of the stipulation reflects the parties' agreement that in the event the Court concludes that ABA's objection to the evidence should be sustained, "the Court shall proceed to determine the merits of plaintiff's claim for permanent injunction on the basis of the evidentiary data stated in paragraph 1 above." [16]

Counsel appropriately directed attention to *General Motors Corporation v. Lord*, 488 F.2d 1096 (8 Cir. 1973), to illustrate the importance of the evidence question presented. That case involved appellate

---

14. Coors' brief in opposition to permanent injunction filed April 26, 1980 contains a recitation of "facts" upon which Coors bases its argument that "ABA was dishonest" and that "ABA violated applicable state and federal law." Rather than citing any portion of the record in its brief, Coors stated in two separate footnotes on pages 7 and 8 of its brief that support for the factual findings stated in its brief was "set forth in Defendant's Proposed Findings of Fact." In light of our detailed discussion of Coors' formally proposed findings of fact, we do not deem it necessary that we deal separately with the "facts" stated in Coors' brief. The findings of fact made in paragraph 64, above, are to be considered as applicable to the "facts" stated in Coors' brief.

15. The questions of law presented under paragraph 5 of the stipulation are set forth in footnotes 4 and 5, above.

16. Paragraph 4 also recited the agreement of the parties that there would be no need for any further discovery or for any additional evidentiary hearing except in the event "the Court concludes that plaintiff ABA's objection to the evidence outlined in Exhibit A should be overruled."

consideration of the district court's action in granting plaintiff's motion for new trial after the jury had returned a verdict in favor of the defendant in an action for an alleged failure to renew an automobile dealer's franchise without just cause. The reason the defendant gave for the termination was that the plaintiff "had violated the Dealer Selling Agreement with GM by entering into an agreement for the sale by Phillips [the plaintiff] to Van Dyke [a third party] of all the stock of Phillips Motors."

At the trial of the case, however, "evidence was presented, over objection, which indicated that financial statements which Phillips Motors had submitted, on a monthly basis, to GM were falsified as to earnings and capital." Evidence was also admitted which established that "the statements varied substantially from the Phillips Motors' books and tax returns" and that "it was also learned that Phillips Motors had operated 'out of trust' condition with the bank which financed Phillips Motors' new and used car purchases."

Both counsel and the Court recognize that the General Motors case is not precisely in point. For it is clear that the district court in the General Motors case specified grounds for granting plaintiff a new trial which did not present exactly the same question presented in the case at bar.[17]

It is nevertheless appropriate that we consider what was said in General Motors for the reason that Coors relies upon exactly the same line of cases cited and relied upon by Judge Bright in his concurring

opinion, whereas ABA, by its citation of General Motors, obviously places reliance on the first line of cases cited by Judge Ross in the majority opinion in that case. General Motors concluded that the district court's resolution of the evidence question did not justify the granting of mandamus for the reason that:

The evidentiary issues confronted by the trial court, with respect to whether GM could rely on non-assigned reasons for termination as a defense to the law suit, are not simple. The trial judge's resolution of the issue is not without support. See, e.g., Ohio & Mississippi R. R. v. McCarthy, 96 U.S. 258, 267–68, 24 L.Ed. 693 (1877); Luckenbach S.S. Co., Inc. v. W. R. Grace & Co., Inc., 267 F. 676, 679 (4th Cir.), cert. denied, 254 U.S. 644, 41 S.Ct. 14, 65 L.Ed. 454 (1920). On the other hand, resolution of the matter as GM urges also has support. See, e.g., College Point Boat Corp. v. United States, 267 U.S. 12, 16, 45 S.Ct. 199, 69 L.Ed. 490 (1925); 3 A. Corbin, Corbin on Contracts § 762 at 524–26 (1960).[18]

Coors argues that it is "entitled to rely upon ... subsequently discovered evidence to support its March, 1980 termination" (page 19 of Coors' brief). Coors contended on page 20 of its brief that:

All Coors here seeks is to show to the Court and rely upon facts subsequently discovered by it, not on another theory, but which actually support and confirm the facts and suspicions in its possession at the time of the termination. Coors

---

**17.** General Motors stated that "it is clear that the trial judge in this case granted the motion for new trial primarily because he believed that he had erroneously permitted the introduction of evidence showing breaches of the Dealership Agreement, not assigned by GM as the reason for termination.

**18.** The majority opinion in General Motors did not state its view in regard to whether Ohio & Mississippi R.R. v. McCarthy and that case's progeny was applicable or whether College Point Boat Corporation v. United States and the progeny of that case should have been applied. Judge Bright did indicate his view in that regard by stating that "I am personally convinced that evidence of dealer misconduct

not specifically relied on by General Motors in terminating the franchise was admissible in this case on the question of breach of contract, see College Point Boat Corporation v. United States, 267 U.S. 12, 45 S.Ct. 199, 69 L.Ed. 490 (1925); Frank Chevrolet Co. v. General Motors Corp., 304 F.Supp. 307 (N.D. Ohio 1968), aff'd. 419 F.2d 1054 (6th Cir. 1969), on the issue of limitation of damages, and for impeachment purposes." As we shall indicate in the text, we are satisfied that the rationale of the line of cases headed by Ohio & Mississippi R.R. v. McCarthy should be applied in ruling the evidence question in this case, rather than the rationale stated in College Point Boat Corporation.

merely wishes to show to the Court and rely upon subsequently discovered facts which in all regards confirm and corroborate the facts known and theories utilized by Coors in ordering the termination.

Coors relies solely upon the *College Point Boat Corporation* line of cases and argues that the *Ohio & Mississippi R. R.* line of cases, which Coors suggest "at first blush seem to reach a contrary result . . . are, however, distinguishable." (page 20 of Coors' brief). The Eighth Circuit did not consider that the two lines of cases were "distinguishable" in *General Motors.* That case suggested that the district court's decision was supported on the one hand by the *Ohio & Mississippi R. R.* line of cases but that had the district court ruled the other way, its decision would have been supported by the *College Point Boat Corporation* line of cases. Such an analysis does not suggest that the two lines of cases are "distinguishable."

Cases which involve a choice of one of the two lines of authority discussed in *General Motors* seldom present completely similar factual circumstances. The rationale of one line of cases in this area of the law has been held to be applicable in some cases; the rationale of the other line of authority has been applied in other cases. We have carefully considered all of the cases cited by the parties and have conducted independent research in an effort to find cases close to the factual circumstances involved in the case at bar. Although we have not found any case precisely in point, we are satisfied as a result of that inquiry that the rationale of the *Ohio & Mississippi R. R. Co.* line of cases should be applied to the stipulated question presented in this case and that ABA's objection to Coors' subsequently discovered evidence should be sustained.

Accordingly, we answer the stipulated legal question of "whether the March 21, 1980 notice of termination may be supported by subsequently discovered evidence, not known by Coors at the time of termination" in the negative.[19]

## IV. *Conclusions of Law* [Continued]

Five of the remaining questions of law submitted by the parties pursuant to paragraph 5 of the stipulation are closely related and will therefore be determined in this part of this memorandum opinion. ABA submitted the following questions in its portion of paragraph 5 of the stipulation:

(a) Whether Coors wrongfully terminated the Agreement with ABA by breaching the Agreement;

(h) Whether R.S.Mo. §§ 407.400 *et seq.* is applicable to a beer distributorship;

(b) Whether Coors wrongfully terminated the Agreement under R.S.Mo. §§ 407.400 *et seq.*

Coors submitted the following closely related questions in its portion of paragraph 5 of the stipulation:

(d) Whether R.S.Mo. § 407.405 is applicable to a beer distributorship and, if so, whether the requirement for a 90-day termination notice actually invalidates a termination notice in disregard thereof, or merely entitles the terminated party to recover, as damages, the loss incurred by the failure to provide such notice.

(c) Whether the issuance of the requested permanent injunction would have the effect of inappropriately extending to ABA the benefits of a distributorship beyond the times described in the distributorship agreement or guaranteed by R.S.Mo. § 407.405.

The five questions submitted under paragraph 5 of the stipulation present, in sub-

**19.** The question answered in the text was quoted from the question submitted by ABA in its subparagraph (g) in Paragraph 5 of the stipulation. We also give a negative answer the question submitted by Coors in its subparagraph (a) of paragraph 5—which reads: "Whether the March 21, 1980 notice of termination may be supported by subsequently discovered evi- dence, not known by Coors at the time of termination, but demonstrating the existence of adequate cause for such termination"—for the reasons we have stated in the text and for the further reason that, on the facts, Coors' subsequently discovered evidence did not, in fact, demonstrate "the existence of adequate cause for such termination."

stance, the basic questions of (1) whether under the factual circumstances Coors breached the Agreement by attempting to terminate without notice and (2) whether R.S.Mo. §§ 407.400 et seq., are applicable to a beer distributorship. The answer to those questions depends upon whether Coors violated any duty owed ABA under either the applicable common law of Missouri or any statutory duty imposed by R.S.Mo. §§ 407.-400 et seq.[20]

### A.

We conclude in regard to the first question that Coors breached the duty of good faith and fair dealing which it owed ABA under applicable Missouri law when it attempted, without actual knowledge of any facts to support the grounds stated in its March 21, 1980 letter, to terminate ABA without notice under Paragraph II(1) of the Agreement.

Section 205 of the Restatement of Contracts, Second, p. 99 states that "Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement." Comment e. to Section 205 of the Restatement of Contracts, Second, entitled *"Good faith in enforcement,"* makes clear that "[t]he obligation of good faith and fair dealing extends to . . . the litigation of contract claims and defenses" and that violations of that obligation include the "abuse of a power . . . to terminate the contract." The Reporter's Note in support of Comment e. to Section 205, id. 104, noted that "several courts have found that an express power to terminate a contract at will was modified by a duty of good faith" and directed comparison to particular sections of the Uniform Commercial Code.

While Section 205 is a new section of the Restatement of Contracts, Second, see Reporter's Note, id., p. 103, we are satisfied that the courts of Missouri will adopt and apply that section of the Restatement in the same manner that the courts of Missouri have in the past consistently adopted and applied various other sections of the original Restatement of Contracts and various other sections in the Restatement of Contracts, Second. Any question about whether the duty of good faith and fair dealing reflects the law of Missouri was removed by the Missouri Legislature's adoption of R.S.Mo. § 400.1–203 in 1963. That section of the Uniform Commercial Code provides that "every contract or duty within this chapter imposes an obligation of good faith in its performance or enforcement."

ABA cited and relied upon a number of sections of the Uniform Commercial Code other than R.S.Mo. § 400.1–203 in partial support of its argument that "the attempted termination of ABA violates Coors' obligations under Missouri law to deal in good faith and reasonably with ABA." See pages 5 to 10 of ABA's brief.

While R.S.Mo. § 400.1–203 codifies the same legal principle stated in Section 205 of the Restatement of Contracts, Second, and therefore supports our conclusion that Section 205 of the Restatement reflects the applicable law of Missouri, we do not believe it is either proper or necessary to discuss the other paragraphs of the Uniform Commercial Code or the cases from other jurisdictions construing those sections which are cited and relied upon by ABA in its brief, for the reason, as Coors correctly points out, that neither side submitted any question in paragraph 5 of the stipulation which presented any question concerning

---

20. The questions separately submitted by the parties in connection with this branch of the case again establish that the disagreement noted by the parties in the stipulation in regard to the legal questions presented is more apparent than real. For it is clear that the question submitted by Coors in its subparagraph (d) in regard to R.S.Mo. § 407.405 is substantially the same question submitted by ABA in its subpar-

agraph (h), except that Coors, by the addition of several clauses on ABA's submitted question, broadens the scope of ABA's question. We shall, of course, consider in the text to follow, the portions of the submitted questions which submit the agreed question of "whether R.S.Mo. §§ 407.400 et seq. is applicable to a beer distributorship."

the applicability of those additional sections of the Uniform Commercial Code.[21]

*Arnott v. American Oil Co.*, 609 F.2d 873 (8 Cir. 1979), illustrates the fact that the duty of "good faith and fair dealing" stated in Section 205 of the Restatement of Contracts, Second, has been adopted as part of the common law of many states other than Missouri. That case, which involved South Dakota law, also illustrates the close relationship between the enactment of franchise legislation by various states and the common law duty of good faith and fair dealing imposed independent of statutes.

The plaintiff alleged in *American Oil Co.* that "Amoco breached the fiduciary duty owed to Arnott by terminating his lease without good cause and by not dealing with Arnott in good faith during the term of the lease agreement." *Id.*, 876. The district court "instructed the jury that a fiduciary relationship existed between the defendant and the plaintiff." *Id.* 880–81. The Court of Appeals noted in *American Oil Co.* that although "South Dakota, in accord with [the] modern trend, enacted the South Dakota Franchise Act, S.D. Compiled Laws, ch. 37–5A (1977) in 1974 . . . this statute is not controlling since the *Arnott* lease agreement was initiated in 1973." *Id.* 883. The *American Oil Co.* court, however, expressed approval of the district court's "view that South Dakota, in enacting the 1974 Franchise Act, 'was codifying what was really the common law in South Dakota, anyway.' " *Id.* 883.

In affirming a judgment for the plaintiff, *American Oil Co.* held that "the current trend of authority recognizes that a franchise relationship exists between a service station dealer and the oil company whose trademark the dealer is promoting. Inherent in a franchise relationship is a fiduciary duty." *Id.* 881. It added that "further indication of the fiduciary nature of a franchise relationship is found in the recent surge of general franchise legislation." *Id.* 883.

 Unlike the factual circumstances in *American Oil Co.*, it is clear that R.S.Mo. § 407.400 was enacted before the Coors and ABA Distributorship Agreement was signed. Our discussion of that statute will establish that Coors owed ABA a fiduciary duty of good faith and fair dealing under the statutory law of Missouri as well as the Missouri common law.

### B.

 The second question to be determined is "whether R.S.Mo. §§ 407.400 *et seq.* is applicable to a beer distributorship," as submitted in ABA's subparagraph (h) of paragraph 5 of the stipulation and as submitted by the first clause of the question submitted by Coors in its subparagraph (d) of Paragraph 5 of the stipulation. We conclude that the submitted question must be answered in the affirmative for the reasons we now state.

Chapter 407 of the present revised statutes of Missouri is not a model of legislative clarity. We have the benefit, however, of the gloss placed on that Chapter by the Supreme Court of Missouri in *Brown-For-*

**21.** Coors argued on page 1 of its brief in opposition that the question of whether Coors' termination of the distributorship violated the *Uniform Commercial Code* "is not properly in the case" and "objects to the introduction of this argument at this time," for the reason "[t]he questions of law before the Court are those set forth in the Stipulation."

While we agree with Coors' proposed conclusion of law No. 3 to the extent that "ABA is precluded from relying on the U.U.C. [because] such an issue . . . was not preserved by the stipulation," we obviously disagree with and expressly reject Coors' further argument that the duty of good faith codified in R.S.Mo. 400.-1–203 is not otherwise imposed on Coors by

other applicable Missouri law. As we have stated in the text, we have concluded that Missouri law, quite independent of R.S.Mo. § 400.-1–203 of the *Uniform Commercial Code, is* consistent with Section 205 of the Restatement of Contracts, Second, and that the Missouri courts would so hold.

Our modified acceptance of Coor's Uniform Commercial Code argument does, however, have the practical effect of mooting any necessity for ruling specifically on ABA's proposed conclusions of law Nos. 8 and 10 through 13, inclusive, and Coors' proposed conclusion of law No. 2, all of which relate to some specific section of the Uniform Commercial Code other than R.S.Mo. 400.1–203.

man *Distillers Corp. v. McHenry,* 566 S.W.2d 194, 196 (Mo.S.Ct. en banc 1978). The *McHenry* court noted that "the title to the bill by which Chapter 407 was originally enacted in 1967 stated that it related 'to certain merchandising practices.'" The *McHenry* court further noted that seven years later, the Missouri General Assembly enacted further legislation on the same general subject of "merchandising practices." It was particularly noted that "House Bill 1132, enacted in 1974, ... defined ['franchises'] for the first time ... and prohibited the cancellation of a franchise agreement without notice." *Id.* 196–97.

House Bill 810, as amended on the floor of the Missouri Senate and adopted by the Missouri General Assembly in 1975, made other amendments to the laws of Missouri "relating to certain merchandising practices." The full text of House Bill 810, with the parts added on the floor of the Senate by Senate amendment No. 1 italicized, is set forth as an appendix to the *McHenry* case. *Id.,* 198–200.[22]

The constitutionality of the 1975 legislation was attacked in *McHenry* on the grounds that (1) the floor amendment to House Bill 810 adopted in the Senate changed the original purpose of that bill and (2) the title of the bill as enacted contained more than one clearly expressed subject in violation of Art. III, §§ 21 and 23 of the Constitution of Missouri.

This Court is under duty to recognize and apply the construction which the *McHenry* court placed on Section 407.400(1) in which a "franchise" was first defined by the Missouri General Assembly when it passed House Bill 1132 in 1974. *See* Laws of Missouri, p. 896, § 1. For it is clear that the Supreme Court of Missouri did place a definitive construction on the meaning of a "franchise," as defined in the 1974 legislation, quite independent of what impact, if any, the 1975 legislation may have had on the definition of a "franchise" as that definition is now contained in present Section 407.400(1).

In regard to the scope of coverage of House Bill 1132, passed in 1974, the Supreme Court of Missouri noted the arguments made by counsel in *McHenry.* That court noted that it was argued that (1) "when Chapter 407 was enacted in 1967 it dealt with 'consumer protection' and the liquor industry was not covered by its terms" and that (2) "contracts or agreements between the distiller or supplier of intoxicating liquor and the wholesaler are not 'franchises' within the meaning of the law adopted by passage of House Bill 810." *Id.,* 196.

The Supreme Court of Missouri noted in *McHenry* that the "trial court concluded that the agreements these plaintiffs had with various wholesalers are franchises within the meaning of these statutes" and held that "we concur in that holding." The *McHenry* court made clear that it was its view that "the law adopted by the enactment of House Bill 1132 [in 1974] applied, before the passage of House Bill 810 [in 1975], to merchandising practices within the liquor industry" and that "the passage of House Bill 810, as amended, made it clear this industry had the same protection in this area of merchandising as other businesses." Id. 197.

The *McHenry* court cited and relied upon *Carlo C. Gelardi Corp. v. Miller Brewing Co.,* 421 F.Supp. 233 (D.N.J.1976), to support its conclusion that under the 1974 legislation "the liquor industry ... had the same protection ... as other businesses." *Miller Brewing Co.* involved the question of whether the New Jersey Franchise Practices Act applied to a beer distributorship agreement. We have already concluded that "the *Miller Brewing Company* litigation presented a factual and procedural situation quite close to that presented in the case at bar." 496 F.Supp. at 1203.

We now note that the New Jersey Act, like the 1974 Missouri Act, did not expressly cover the liquor industry. The first para-

---

**22.** We attach the appendix appended to *McHenry* as an Appendix to this Memorandum Opinion.

graphs of both the New Jersey Act and the 1974 Missouri Act in which a "franchise" was defined, consistent with similar legislation in many other states, were identical. Miller Brewing Company, in the case which pended in the District of New Jersey, as does Coors in this case, "questioned whether its relationship constituted a 'franchise' within the meaning of the Act." 421 F.Supp. at 234. Judge Barlow concluded that the failure of the New Jersey legislature to specifically name the liquor industry as being within the coverage of the Act was not significant and that, absent clear legislative intent to the contrary, the Act should not be read "to exclude particular industries ... from the protection of the Act." 421 F.Supp. at 234, fn.1. The New Jersey Act required that a 60 day notice of termination be served in which the reasons for termination were to be stated. *See* N.J. State Ann. 56:10–5, set forth in footnote 17 on page 246 of 421 F.Supp.

The district court in *Miller Brewing* found that Miller had not served such a notice as required by the Act and therefore entered an order "directing Miller to comply with the sixty-day notice provision of N.J.Ann. § 56:10–5."

The conclusion of the Supreme Court of Missouri in *McHenry* that the 1974 Missouri legislation was broad enough to cover the liquor industry is, however, a significant statement of state law in regard to how the franchise protection statutes of Missouri should be construed by this Court.

The question of whether the courts of Missouri would hold that the 1975 enactment of House Bill 810, as amended on the floor of the Senate, was intended to remove and exclude the liquor industry from the coverage of Missouri's 1974 legislation is not, in our considered judgment, controlled by the considerations stated in footnote 4 of

the majority opinion of the Court of Appeals in *ABA Distributors, Inc. v. Adolph Coors Co., supra*, at 715, fn.4. That footnote stated the following:

The district court noted that ABA's motion presented "questions related to the notice of termination to which plaintiff may be entitled under the Missouri Franchise Act... 496 F.Supp. at 1203. No finding relative to the likelihood of resolving these questions favorably to ABA was made.

The parties have not argued or briefed the details of the application of the Missouri Act. We note, however, that the Act by its terms protects only wholesalers licensed to sell "spirituous liquor and wine containing alcohol in excess of five percent by weight ...." R.S.Mo. § 407.-400. Beer is not a spirituous liquor. See *State v. Watts*, 101 Mo.App. 658, 74 S.W. 377 (1903). It does not strain judicial notice to note that beer is not wine. Therefore, whether ABA may properly invoke the protections of the Missouri Franchise Act is open to question.

Unlike the Court of Appeals, this Court has had the benefit of the briefs and arguments of counsel. We are satisfied that the courts of Missouri would not determine the question presented by taking judicial notice of the fact that "beer is not wine" or that "beer is not a spirituous liquor." Nor do we believe that the courts of Missouri would consider the affirmance of a defendant's conviction of a violation of § 3016 of the 1899 Missouri Revised Statutes in *State v. Watts*, 101 Mo.App. 658, 74 S.W. 377 (Mo.Ct. of App.St.L.1903), as a precedent controlling the question of law submitted by the parties in their stipulation.[23]

We are satisfied that the courts of Missouri would continue to place reliance on the rationale of *Miller Brewing Company*,

---

**23.** The indictment in *State v. Watts* alleged that the defendant did "unlawfully sell certain spirituous liquors, to wit, one pint of beer." The defendant contended that his conviction should be reversed because "the phrase, to wit, "one pint of beer," should be stricken out of the indictment, for the reason that it is not a spirituous liquor." The Missouri Court of Appeals rejected that defense by first noting that "our statute regulating the sale of intoxicating li-

quors defines intoxicating liquores to 'mean fermented, vinous or spirituous liquors, or any composition of which fermented, vinous or spirituous liquors is a part.' Section 3016, Rev.St. 1899." It then concluded "that the indictment described the beer as a spirituous liquor did not ... require the state to prove that it was a spirituous liquor. All that the state was required to prove was that defendant illegally sold beer to George Likens." The

as the Supreme Court of Missouri has already done in *McHenry*. We conclude that the courts of Missouri would therefore make inquiry as to whether either the language of House Bill 810, as amended, or any available legislative history suggests that the Missouri General Assembly intended to exclude any part of what the *McHenry* court repeatedly referred to as "the liquor industry" when it passed the 1975 legislation.

Consistent with well established *Erie* principles, this Court must make the same inquiry. We note first that there is no legislative history to examine. Secondly, we conclude that the courts of Missouri would hold that the Missouri General Assembly intended to continue the coverage of its 1974 legislation, which *McHenry* held was broad enough to cover all wholesalers in the liquor industry, including but not limited to beer distributors, and that the Missouri General Assembly by its somewhat confusing use of the words "spirituous liquor and wine" in its 1975 legislation, did not intend to exclude and eliminate by negative implication any wholesaler of beer or any other wholesaler of "intoxicating liquor," as that term is defined in R.S.Mo. § 311.020.

The courts of Missouri, consistent with the courts of many other jurisdictions, in-

frequently restrict the coverage of statutes by application of concepts of negative implication. This is particularly the case where the objective and purpose of the statute under consideration is broad and obviously intended to prohibit what the legislature deemed to be a harmful practice. *McHenry* held that both the amendments proposed for the 1974 legislation by House Bill 810 and by the Senate floor amendment had "for their general purpose the security of business franchises: the prohibition of cancellation or termination of such franchise agreements without cause and notice." 566 S.W.2d at 197.

We do not believe that the courts of Missouri would conclude that the Missouri General Assembly, by its 1975 amendments to the 1974 legislation, intended to eliminate and exclude the coverage of beer distributors as it had earlier provided for their coverage in its 1974 legislation. We accordingly conclude that the stipulated question of "whether R.S.Mo. § 407.400 *et seq.*, is applicable to a beer distributorship" must be answered in the affirmative.

### C.

■ On page 4 of its brief Coors makes the following alternative argument in regard to Section 407.405:

court thus considered the breadth of the statute, rather than the language of the indictment to be important.

It is of interest to note that Chapter 311 of the Missouri Statutes, to which reference is made in present Section 407.400, expressly provides in R.S.Mo. § 311.050 of that Chapter that "it shall be unlawful for any person, firm, partnership or corporation to manufacture, sell or expose for sale in this state *intoxicating liquor*, as defined in section 311.020, in any quantity, without taking out a license." R.S.Mo. § 311.-020, referred to in that section, provides that "the term 'intoxicating liquor' as used in this chapter, shall mean and include alcohol for beverage purposes, alcoholic, spirituous, vinous, fermented, malt, or other liquors, or combination of liquors, a part of which is spirituous, vinous, or fermented, and all preparations or mixtures for beverage purposes, containing in excess of three and two-tenths per cent of alcohol by weight."

Coors' citation and reliance upon other sections of Chapter 311, see page 11 of Coors'

brief, reflects Coors' concession that it is within the coverage of Chapter 311 rather than Chapter 312 of the Missouri Liquor Control Law which, in R.S.Mo. § 312.020 provides that "beer having an alcoholic content of not less than one-half of one per cent by volume nor exceeding three and two-tenths per cent by weight, is hereby declared to be 'nonintoxicating beer,' and may be lawfully manufactured and sold, or sold, in this state by any holder of a permit issued by the supervisor of liquor control of this state, authorizing such manufacture and sale, or sale, and may be lawfully transported, sold and consumed, in this state, and may be lawfully shipped into, or out of, this state subject to such inspection fees, and/or taxes, and under such regulations as may be provided by law."

We take judicial notice of the fact that no one has ever contended in this case that Coors beer is to be considered a "non-intoxicating beer" and therefore Coors is subject to the provisions of Chapter 312, rather subject to Chapter 311.

[E]ven if 407.405 were here applicable, Coors was entitled to terminate ABA's distributorship without 90 days prior written notice. That statute would not here impose the 90-day written notice requirement for termination. That section states that:

> ... except that when criminal misconduct, fraud, abandonment, bankruptcy or insolvency of the franchisee, or the giving of a no account or insufficient funds check is the basis or grounds for cancellation or termination, the ninety days notice shall not be required.[24]

Coors' brief concedes, however, that the "facts" relied upon by Coors to support its alternative argument that "ABA was guilty of criminal misconduct and fraud" within the meaning of Section 405.405 are exactly the same "facts" upon which Coors attempted to rely to support its termination letter of March 21, 1980. Our finding of fact that Coors had no actual knowledge of any facts to support its charges of ABA's "dishonesty" or of ABA's "violation of state and federal law" when it wrote the March 21, 1980 letter requires that Coors' alternate Section 407.405 argument be rejected on the basis of the findings of fact made in connection therewith.

### D.

To recapitulate, we answer the five stipulated questions of law set forth at the outset of this part of our Memorandum Opinion as follows:

ABA (a). The question "whether Coors wrongfully terminated the Agreement with ABA by breaching the Agreement" is answered in the affirmative.

ABA (h). The question of "whether R.S.Mo. §§ 407.400 et seq., is applicable to a beer distributorship" is answered in the affirmative.

ABA (b). The question "whether Coors wrongfully terminated the Agreement under R.S.Mo. §§ 407.400 et seq." is answered in the affirmative.

Coors (d). Coors' subparagraph (d) submitted three separate but related questions. The first part of that question, "whether R.S.Mo. § 407.405 is applicable to a beer distributorship ...." is answered in the affirmative. The second part of that question "... and, if so, whether the requirement for a 90-day termination notice actually invalidates a termination notice in regard thereto" is answered in the affirmative. The third part of that question "... or merely entitles the terminated party to recover, as damages, the loss incurred by the failure to provide such notice" is answered in the negative.

Coors (c). The question "whether the issuance of the requested permanent injunction would have the effect of inappropriately extending to ABA the benefits of a distributorship beyond the times described in the distributorship Agreement or guaranteed by R.S.Mo. § 407.405" is answered in the negative.

In order to further clarify the rationale of our decision of the stipulated questions submitted by the parties, we state the following additional formal conclusions of law in response to those proposed by the parties.[25]

> We reject Coors' proposed conclusion of law No. 5 for the reasons stated in the text to support our rejection of Coors' alternative argument in regard to Section 407.405.

**24.** Coors makes the same implicit argument in paragraph 5 of its proposed conclusions of law which stated that:

> Even if R.S.Mo. 407.405 were applicable to the arrangement between ABA and Coors, Coors was justified in terminating the distributorship without giving the 90 days notice provided therein because of ABA's criminal misconduct and its actual and constructive fraud worked on Coors through the misrepresentation of facts and the concealment of other facts material to the affairs of the parties.

**25.** We have added in parenthesis after each number of the conclusions of law stated, the paragraph numbers of the conclusions of law as proposed by the parties. It is to be noted that while the conclusions of law we have stated are keyed to and agree generally with those proposed by counsel, we have in some instances substantially modified the language proposed by counsel to reflect our own view of the applicable law.

1. (ABA–5) The Distributorship Agreement between ABA and Coors established a franchise relationship.

2. (ABA–6) Under applicable Missouri law, the Distributorship Agreement imposed upon both parties a duty of good faith and fair dealing in the performance and the enforcement of that Agreement.

3. (ABA–7) Coors' attempt, under the factual circumstances found in this case, to terminate ABA without notice breached its fiduciary duty to ABA, its duty of good faith and fair dealing owed by it to ABA, and breached the Distributorship Agreement between the parties.

4. (ABA–14) The relationship between ABA and Coors was a "franchise" within the meaning of R.S.Mo. § 407.400(1).

5. (ABA–15) ABA was entitled to at least ninety days notice of Coors' attempted terminations under R.S.Mo. § 407.405.

■ 6. (ABA–16) Coors' attempt to terminate ABA without notice violated R.S.Mo. § 407.405.

7. (ABA–17) ABA is entitled to equitable relief under R.S.Mo. § 407.410.[26]

For purposes of still additional clarity, we expressly conclude that the three conclusions of law proposed by Coors in regard to the stipulated questions considered in this part of our memorandum opinion, as set forth in the footnote below, should be and are expressly rejected for the reason that

such proposed conclusions of law are not consistent with applicable Missouri law.[27]

V. *Conclusions of Law* [Continued]

A.

■ The remaining questions submitted for determination under paragraph 5 of the stipulation relate to what remedy ABA may be entitled under the circumstances. Once again, the apparent disagreement of the parties in regard to the basic question presented is more apparent than real.

ABA, in its subparagraph (i) of paragraph 5 of the stipulation, submitted the question of "whether ABA's loss of its right to sell its distributorship may be adequately remedied by an award of damages." The question submitted by Coors in its subparagraph (e) of paragraph 5 of the stipulation submitted exactly the same question to which it added a clause which stated ". . ., and is thus not an irreparable injury."

Part VI of our September 3, 1980 Memorandum Opinion, 496 F.Supp. at 1202–04, discusses the relief which this Court believed ABA might be entitled on the merits. We opened that discussion by stating that "if successful on the merits, plaintiff would, at the least, be entitled to have the termination attempted in defendant's March 21, 1980 letter set aside as invalid." We stated on the same page that:

Even if it be assumed that the most plaintiff would be entitled to on the mer-

---

**26.** Contrary to Coors' contention that ABA has no right to equitable relief, Section 407.410(2) expressly provides:

A franchisee suffering damage as a result of the failure to give notice as required of the cancellation or termination of a franchise, may institute legal proceedings under the provisions of sections 407.400 to 407.420 against the franchisor who canceled or terminated his franchise in the circuit court for the circuit in which the franchisor or his agent resides or can be located. When the franchisee prevails in any such action in the circuit court, he may be awarded a recovery of damages sustained to include loss of goodwill, costs of the suit, *and any equitable relief that the court deems proper.* (emphasis ours)

**27.** Coors' three proposed conclusions of law referred to in the text stated:

1. (C–4) R.S.Mo. 407.405 is not applicable to the contractual arrangement between ABA and Coors, as such section, insofar as it deals with the termination of franchises, is applicable only to situations involving wholesalers of spirituous liquor and wine.
2. (C–6) Violation of R.S.Mo. 407.405, through the termination of a franchisee in the absence of 90 days prior written notice, does not entitle such franchisee to injunctive relief reinstating the franchise when damages suffered by the franchisee, including the lost profits for the 90-day period, are subject to adequate proof and the franchisor is financially able to respond.
3. (C–7) Any damage suffered by ABA, including lost profits for the 90 day period envisioned by R.S.Mo. 407.405, may be the subject of adequate proof, and Coors is adequately able to respond thereto.

its would be to have the March 21, 1980 notice set aside as invalid, such action would apparently reinstate paragraph VIII of the Agreement which would permit plaintiff to sell his distributorship on terms mutually agreeable to plaintiff and the purchaser, provided defendant Coors would give its approval of the new owner in writing. Should the attempted termination of March 21, 1980 be set aside as invalid on the merits and should defendant thereafter elect to terminate under paragraph IX(1), plaintiff might in that event, acquire rights as provided in paragraph VIII(2). And, in any event, should it be adjudicated that defendant has the right to terminate on thirty days notice, certainly plaintiff would have a thirty day period within which to arrange for an appropriate sale of the distributorship.

We closed our Part VI discussion of remedy with the following paragraph:

> While we are not at all satisfied that plaintiff, on the merits, would ever be entitled to full reinstatement as a distributor for the defendant on any kind of permanent basis, we are satisfied and specifically find and conclude that the plaintiff has established a substantial probability of obtaining some equitable relief on the merits and that it would suffer irreparable injury within the meaning of the applicable standard if injunctive relief were denied. (*Id.* 1204)

While the Court of Appeals dissolved the preliminary injunction issued by this Court and remanded the case for action consistent with its opinion, the majority opinion of the Court of Appeals affords substantial guidance in regard to the remedy ABA is enti-

tled under the factual circumstances established after remand. The majority opinion of the Court of Appeals stated that:

> The district court may have based the grant of injunctive relief on the conclusion that ABA is likely to succeed in proving that Coors' attempt at termination did not meet the cause and notice of requirements of the contract and, possibly, of Missouri law. The proper remedy for such violations would be an order for ABA [sic] to comply with the procedural requirements of the contract or Missouri law. [661 F.2d at 714–15]

Further guidance is afforded by the Court of Appeals' citation of Judge Barlow's May 27, 1976 opinion in *Carlo C. Gelardi Corp. v. Miller Brewing Co.*, 421 F.Supp. 233 (D.N.J.1976). That case, as above noted, concluded that the beer distributorship there involved was a "franchise" within the meaning of the New Jersey Franchise Act. The district court accordingly entered its order "directing Miller to comply with the 60-day notice provision" of that Act.

The Court of Appeals also cited *Guinness-Harp Corp. v. Jos. Schlitz Brewing Co.*, 613 F.2d 468, (2nd Cir. 1980) with approval. The district court in that case entered what the Court of Appeals considered to be a final injunction which set aside Schlitz' attempted termination of a beer distributorship and required the parties to comply with the contract provisions contained in their distributorship agreement.[28] In affirming the district court's grant of final equitable relief in *Schlitz Bros.*, the Court of Appeals concluded that the order of the district court simply "maintains the distrib-

---

**28.** The Schlitz distributorship agreement contained a clause quite similar to Paragraph IX(2) of the Agreement involved in this case. Both agreements provided that the beer manufacturer could serve a notice that the distributor had breached or was in default of some condition of the contract and that the distributor had an appropriate period of time within which to cure or correct the breach. The Schlitz agreement provided, as does Paragraph XV of the Agreement involved in this case, that the question of whether the distributor had in fact corrected the contract breach was subject to arbitration.

The Schlitz agreement, unlike the Agreement involved in this case, expressly provided that arbitration procedures had to be carried out "prior to the termination of Buyer by Seller."

The Court of Appeals apparently did not consider, and certainly we do not consider, that factual difference as a ground for distinguishing the cases. Both the *Schlitz* case in the Second Circuit and the case at bar involve the basic question of whether the parties are entitled to equitable relief after an attempted termination is held to be invalid.

utorship pending arbitration, and that is the relief for which Guinness brought this law suit." The Second Circuit held that "to establish its entitlement to an injunction to enforce its interpretation of the status quo provision of the agreement, plaintiff must satisfy the traditional equitable standards for specific performance of a contract." The court, of course, concluded that the plaintiff had satisfied those standards.

Judge Walter Sanborn's opinion in *National Marketing Mach. Co. v. Triumph Mfg. Co.*, 13 F.2d 6 (8th Cir. 1926), is one of the leading cases in the country which sets forth the standards that a plaintiff must satisfy in order to be entitled to equitable relief. That case concluded that the following principles of equity were "established beyond debate or the necessity for the citation of authority:"

> The adequate remedy at law, which will preclude the grant of specific performance of a contract by a court of equity, must be as certain, prompt, complete, and efficient to attain the ends of justice as a decree of specific performance.

and that:

> An injunction against the breach or the continuance of a breach of a contract is a negative decree of specific performance, and the power and duty of a court of equity to grant such an injunction is even greater, under the rules, principles, and practices in equity, than its power and duty to grant decrees of specific performance.

Judge Walter Sanborn's opinion in *National Marketing* was cited and followed in *Snip v. City of Lamar*, 239 Mo.App. 824, 201 S.W.2d 790 (1947).

*Laclede Gas Co. v. Amoco Oil Co.*, 522 F.2d 33 (8th Cir. 1975), a more recent Eighth Circuit case, reversed the Eastern District of Missouri and directed that court to enter a decree granting equitable relief in a case in which one of the parties wrongfully attempted to cancel a written agreement designed to provide propane gas distributorships to various residential developments in Jefferson County, Missouri. The Eighth Circuit recognized in *Amoco Oil Co.* that "it is axiomatic that specific performance will not be ordered when the party claiming breach of contract has an adequate remedy at law." It concluded, however, that the rule stated was not an absolute one, holding that:

> However, in Missouri, as elsewhere, specific performance may be ordered even though personalty is involved in the "proper circumstances." Mo.Rev.Stat. § 400.2–716(1); Restatement of Contracts, *supra*, § 361. And a remedy at law adequate to defeat the grant of specific performance "must be as certain, prompt, complete, and efficient to attain the ends of justice as a decree of specific performance." *National Marketing Mach. Co. v. Triumph Mfg. Co.*, 13 F.2d 6, 9 (8th Cir. 1926). *Accord, Snip v. City of Lamar*, 239 Mo.App. 824, 201 S.W.2d 790, 798 (1947).[29]

The standards stated in the cited cases support our conclusion that the question submitted under the stipulation of "whether ABA's loss of its right to sell its distributorship may be adequately remedied by an award of damages," must be answered in the negative. The majority opinion of the Court of Appeals in this case clearly indicated that should this Court find that Coors' attempted termination did not meet the requirements of the contract or of Missouri law, the proper remedy for such a violation would be an order that required the parties to comply with the requirements of their contract and Missouri law. The remedy

**29.** The attention of counsel is directed to the later appeal in *Laclede Gas Company v. Amoco Oil Company*, reported in 531 F.2d 942 (8 Cir. 1976). That appeal shows that the district court, on remand, did enter a decree granting equitable relief. The per curiam opinion, however, dismissed the appeal from that order for lack of jurisdiction under 28 U.S.C. § 1291 in that plaintiff's claims for damages remained outstanding under plaintiff's complaint in that case.

Should counsel wish to discuss any apparent problems in regard to any appeal of the orders and judgment entered in this case they may arrange for a conference with the Court through our Law Clerk.

suggested by the Court of Appeals would be totally ineffective unless the parties, after Coors' attempted termination is set aside as invalid, are restored to the positions which each occupied before Coors' made its invalid attempt to terminate the Agreement without notice.

The formal conclusions of law which we shall make later in this part of our memorandum opinion will state our specific view of why an award of damages is inadequate under the circumstances of this case. We turn now to the other questions submitted for determination pursuant to paragraph 5 of the stipulation.

### B.

In subparagraph (c) of paragraph 5 of the stipulation, ABA submitted the following question: "(c) If the Court's determination with respect to either question (a) or (b) above is affirmative, whether ABA is entitled to have the notice of termination set aside." In light of the fact that both questions submitted in ABA's subparagraphs (a) and (b) have been answered in the affirmative, it is obvious that the question submitted in ABA's subparagraph (c) is also answered in the affirmative.

In subparagraph (d) of paragraph 5 of the stipulation, ABA submitted the following question: "(d) If the March 21, 1980 notice of termination is set aside, whether ABA has the right to sell the distributorship." A conditional affirmative answer must be given to that question. For it is clear that any sale of the distributorship is subject to the provisions of Paragraph VIII of the Agreement.[30]

The practical effect of the relief granted does no more than set aside Coors' unlawful attempts to terminate the Agreement without notice and to temporarily reinstate the Agreement as it stood before those unlawful attempts to terminate were made. The relief granted also requires that any future termination attempt by Coors shall be pursuant to some paragraph of the Agreement which permits termination on notice and that any notice that may be given shall be given "in writing at least ninety days in advance of the . . . termination," as required by R.S.Mo. § 407.405. It is thus apparent that ABA will have a short period of time within which to present for Coors' approval a sale mutually agreeable to ABA and some third party, as provided in Paragraph VIII of the Agreement.

Judge Heaney correctly stated the effect of the equitable relief that will be granted in this case when he anticipated that ABA would likely "obtain a court order temporarily restoring [ABA's] franchise" and that ABA would "then be able to transfer the franchise to another company and recover its investment and goodwill in the process." 661 F.2d at 716. Judge Heaney's added observation that "While Coors must approve the transferee, it obviously cannot unreasonably withhold approval" is an accurate statement of the applicable Missouri law and reflects the view of this Court.

It is thus clear that the question submitted in ABA's subparagraph (e) which stated: "(e) If the notice of termination is set aside, and ABA has the right to sell the distributorship, whether Coors can unreasonably withhold approval of a proposed sale" is answered in the affirmative.[31]

---

**30.** Paragraph VIII of the Agreement provides in part the following:

VIII
SALE OF DISTRIBUTORSHIP

(1) The distributorship may be sold on terms mutually agreeable to the buying and selling parties, provided Coors has given its approval of the new owner in writing. Coors shall have complete discretion to approve or disapprove such prospective purchaser on grounds sufficient in Coors' sole judgment. Coors specifically shall have the right to disapprove the prospective buyer if

in Coors' judgment the terms of sale of the distributorship between the seller and prospective buyer are such that the prospective buyer does not have a reasonable opportunity to make a financial success of the distributorship. No sale shall be completed until all accounts between the seller and Coors have been settled and a complete, absolute, mutual release executed and delivered to the said parties.

**31.** Coors argued on page 22 of its original brief that the question just answered and other questions submitted by ABA in ABA's subpara-

Neither an unqualified affirmative nor an unqualified negative answer can be given to the question submitted by ABA in subparagraph (f) of paragraph 5 of the stipulation as to "(f) Whether ABA is entitled to an order indicating the proper means by which Coors could terminate ABA, if the March 21, 1980 notice of termination is set aside." For we have made clear that the relief granted in this case does no more than temporarily restore the Agreement. Under temporary restoration of the Agreement, Coors has the right to elect whether it may wish to terminate the Agreement with notice in accordance with either subparagraph (1) or subparagraph (2) of Paragraph IX of the Agreement.[32] If Coors should elect to exercise the power granted it under paragraph IX(1), the applicability of R.S.Mo. § 407.405 would, of course, require that Coors give ABA "at least 90 days advance written notice," rather than the 30 days provided in that paragraph of the Agreement.

It is also clear that should Coors elect to act under paragraph IX(1), paragraph VIII(2)[33] would come into play with the result that Coors would become obligated to pay ABA, in cash (a) the fair market value of the assets used by ABA to distribute Coors beer, (b) the cost of the inventory of Coors products on hand on the effective date of the termination, and (c) an amount equal to one-twelfth of the previous twelve months of Coors sales for the goodwill of the distributorship. Should the parties disagree about "the amounts to be determined pursuant to paragraph VIII(2)(a), (b), or (c)," either party would have the right to demand arbitration under the last subparagraph of Paragraph XV, the arbitration clause of the Agreement.[34]

graphs of paragraph 5 of the stipulation sought "anticipatory rulings of this Court on hypothetical factual situations not now before it." The same argument is presented in even greater detail in the brief most recently filed by Coors in its effort to sustain the validity of its May 21, 1982 letter in which it again attempted to terminate ABA without notice.

We expressly reject Coors' argument. Coors agreed to the stipulation under which both parties submitted questions of law for this Court's determination. If Coors believed that any question submitted in paragraph 5 of the stipulation was improperly before the Court it should have so stated before it signed the stipulation. Having signed the stipulation, Coors cannot at this date attempt to change its position in regard to the questions before the Court.

**32.** See footnote 10 for Paragraph IX(1) and (2) of the Agreement.

**33.** Paragraph VIII(2) of the Agreement provides:

(2) In the event that Coors terminates Distributor pursuant to Article IX(1) hereinbelow, Distributor shall have, for a period of 30 days after the mailing of the termination notice, the option to require that Coors purchase certain assets of the Distributorship upon the following terms:
Payment by Coors in cash, free and clear of all liens and encumbrances:
(a) The fair market value of the assets used by Distributor to distribute Coors beer only.
(b) The cost of inventory of Coors products of Distributor on hand on effective date of termination.

(c) Goodwill of the distributorship in an amount equal to one-twelfth of the previous full twelve months' Coors sales of the distributorship.

**34.** Paragraph XV of the Agreement provides the following:

### XV
### ARBITRATION

In the event that Coors shall serve written Notice of Termination pursuant to paragraph IX(2) herein upon Distributor as set forth hereinabove, Distributor may, within ten days thereafter, serve a written notice upon Coors which shall demand arbitration of whether proper cause as set forth in the said Notice of Termination existed. Such arbitration shall be conducted in accordance with the published Rules and Procedures of the American Arbitration Association, a copy of which are attached hereto, and applicable Colorado Rules of Civil Procedure, all as herein limited.
The parties hereto agree that arbitration shall be the sole remedy of either party against the other party as to whether the termination was for the cause specified in the notice, subject to the right of either party to judicial review of the Arbitration Award.
The parties agree that any arbitration hereunder shall be confined to a determination whether in fact the cause specified by Coors in the Notice of Termination served upon Distributor existed. The grounds for termination as set forth in the Notice of Termination shall in any event be based upon the written provisions of the Distribution Contract between the parties. The Arbitrator may not add to or subtract from such written

Should Coors, on the other hand, elect to terminate under paragraph IX(2) of the Agreement, any disagreement in regard to whether ABA may have corrected any alleged breach or default specified in the written notice required by that paragraph would also be subject to arbitration, as expressly provided in paragraph XV of the Agreement.[35]

## C.

The parties proposed many more conclusions of law for our consideration in regard to ABA's right to relief and the form of such relief than any other portion of this case. We do not believe that it is necessary that we separately discuss each conclusion of law proposed on this branch of the case in order to further clarify the rationale of our determination of the questions of law submitted under paragraph 5 of the stipulation as discussed in this part of our memorandum opinion.

We shall therefore expressly reject the conclusions of law proposed by Coors in paragraphs Nos. 11 through 15, inclusive, and in paragraphs Nos. 19 through 23, inclusive, of Coors' proposed conclusions of law. We state the following additional conclusions of law, adopting and modifying various conclusions of law proposed by

ABA. We follow the same procedure as followed above in regard to numbering our additional formal conclusions of law by adding the number of ABA's proposed conclusions of law in parenthesis after the number we have given our additional conclusions of law:

8. (ABA–29). ABA is entitled to an order declaring that Coors' attempt to terminate the Agreement without notice by its March 21, 1980 letter was invalid.

9. (ABA–30). ABA is entitled to an order permanently enjoining Coors from further attempting to carry out the termination it unlawfully attempted in its March 21, 1980 letter.

10. ABA is entitled to an order declaring that Coors' attempt to terminate the Agreement without notice by its May 21, 1982 letter was invalid.[36]

11. ABA is entitled to an order permanently enjoining Coors from further attempting to carry out the termination it unlawfully attempted in its May 21, 1982 letter.

12. (ABA–31). ABA is entitled to an order permanently enjoining Coors from making any further attempt to terminate the Agreement without notice under the

contractual provisions and may not substitute his or her judgment or discretion for that of Coors. In no event shall service of a Demand for Arbitration stay the effect of the Notice of Termination served by Coors upon Distributor.

In the same manner and subject to the same terms and conditions contained herein, either party may demand arbitration of the amounts to be determined pursuant to paragraphs VIII(2)(a)(b) or (c).

**35.** The majority opinion of the Court of Appeals in this case quoted the arbitration paragraph XV of the Agreement in a footnote in 661 F.2d at 715, fn. 5, and stated in the text of that opinion that ABA "has pointed to nothing in the already massive record in this case to indicate that it did anything to invoke the mandatory arbitration clause of the distributorship agreement." There still is nothing in the record to show that ABA has done anything to invoke arbitration under the Agreement for the very good reason that what the majority opinion of the Court of Appeals described as a

"mandatory arbitration clause" simply does not provide for arbitration of any attempt by Coors to terminate the Agreement without notice under Paragraph II(1) of the Agreement.

With all due respect to the Court of Appeals, we must state that we do not view the majority opinion's discussion of the arbitration clause in the Agreement as a bar to either party's potential right to demand arbitration of any decision made under the Agreement which may be made in connection with some future attempt by Coors to terminate by written 90-day notice under either (1) paragraph IX(1) and VIII(2) of the Agreement or (2) paragraph IX(2) of the Agreement.

**36.** The conclusion of law stated in this paragraph and in the next succeeding paragraph No. 11 both relate to Coors' most recent attempt to terminate the Agreement without notice pursuant to a letter written May 21, 1982 which is discussed in detail in Part VI, *infra*, of this memorandum opinion.

provisions of Paragraph II(1) of the Distributorship Agreement.

13. (ABA–32). ABA is entitled to an order which will temporarily reinstate the Agreement between the parties.[37]

14. (ABA–21). Coors' unlawful attempt to terminate ABA without notice left ABA without an adequate remedy at law and irreparably injured ABA.

15. (ABA–27). Money damages could never adequately compensate ABA for its injuries suffered as a result of Coors' attempted unlawful terminations.

16. (ABA–20). Coors' attempts to terminate ABA without notice deprived ABA of any right to recoup its investment.[38]

17. (ABA–22). ABA's loss of its potential right to sell its business left ABA without an adequate remedy at law and irreparably injured ABA.

18. (ABA–23). ABA's loss of its potential right to arbitration under the Agreement left ABA without an adequate remedy at law and has irreparably injured ABA.

19. (ABA–24). ABA's potential loss of its right under the Agreement to be compensated for good will as a result of Coors' unlawful attempted terminations left ABA without an adequate remedy at law and irreparably injured ABA.

20. (ABA–33). ABA is entitled to an order requiring Coors, in any future effort it may elect to take in regard to terminating ABA, to comply with the provisions of Paragraph IX(1) or Paragraph IX(2) of the Distributorship Agreement.

21. (ABA–34). ABA is entitled to an order requiring Coors, in any future effort it may elect to take in regard to terminating ABA, to give ABA at least ninety days notice as required by R.S.Mo. § 407.405.

22. (ABA–36). ABA is entitled to an order declaring that it may sell its distributorship pursuant to Paragraph VIII(1) of the Distributorship Agreement during the limited period of time that Agreement is temporarily reinstated and the effective date of any termination which Coors may elect to serve notice under the provisions of Paragraph IX(1) or Paragraph IX(2) of the Agreement.

23. (ABA–37). ABA is entitled to an order declaring that Coors may not unreasonably or arbitrarily withhold approval of a proposed sale of ABA's distributorship to a prospective buyer.

24. (ABA–18 and 19). ABA is entitled to an order declaring that in the event Coors elects to attempt to terminate ABA under either paragraph IX(1) or paragraph IX(2) of the Agreement, both parties have the right to demand arbitration as provided in paragraphs VIII(2) and XV of the Agreement.

### VI. *Motion for Contempt*

On June 4, 1982, after the stipulated questions of law to be decided had been fully briefed and were under advisement, ABA filed a motion for an order directing Coors to show cause why it should not be held in civil and criminal contempt for violation of this Court's Order entered December 7, 1981. That order, the form of which was agreed to by the parties, was entered following a conference with the parties with respect to the procedures to be fol-

---

**37.** It is to be noted that we have substantially modified the broad language of ABA's proposed conclusion of law No. 32 which proposed that we conclude that "ABA is entitled to an order reinstating ABA as a distributor of Coors beer products."

Our modification is made consistent with the "proper remedy" comment in the Court of Appeals' majority opinion and with the comment in Judge Heaney's dissenting opinion in regard to an "order temporarily restoring the franchise." Our conclusion of law is designed to support the type of limited orders entered in

*Miller Brewing Co., supra,* and the district court order affirmed by the Second Circuit in *Jos. Schlitz Brewing.*

**38.** See *Lockewill v. United States Shoe Corp.,* 547 F.2d 1024, 1029 (8 Cir. 1976), in which the Eighth Circuit, applying Missouri law (particularly that stated in the leading Missouri case of *Beebe v. Columbia Axle Co.,* 117 S.W.2d 624 (K.C.Ct. of A. 1938)), discussed the Missouri doctrine of recoupment which is applied in Missouri quite independently of any agreement of the parties to a contract.

lowed after remand.[39] That order provided that:

1. The current status of the distributorship will remain the same. No change will be made without prior notice to all parties.

Plaintiff's pending motion states that on May 26, 1982 plaintiff received a letter from defendant dated May 21, 1982 which "purported to immediately terminate ABA under Article II(1) of the Distributorship Agreement 'if our notice of March 21, 1980 is for any reason ever found by the courts to be ineffective.'" ABA contends that this letter violates the Court's order by radically altering the "current status of the distributorship."

In its response filed June 15, 1982 Coors contends (1) that the purpose of this Court's order quoted above was merely to prevent sale of the distributorship prior to the Court's ruling on the legal questions submitted for determination under the stipulation of the parties. Coors also suggests that its May 21st letter, in any event, is prospective in effect and therefore can not violate the December 7, 1981 order since it becomes effective only if this Court holds the March 21, 1980 termination invalid.

We had already reached the conclusion that ABA was entitled to an order permanently enjoining Coors from making any further attempt to terminate the Agreement without notice under the provisions of Paragraph II(1) of the Distributorship Agreement before Coors wrote its May 21, 1982 letter. We had also reached the conclusion that the question stipulated by both parties in their respective paragraphs of Paragraph 5 of the stipulation as to "whether R.S.Mo. § 407.405 is applicable to a beer distributor" must be answered in the affirmative. And, finally, we had already reached the conclusion that ABA was entitled to an order requiring Coors, in any future effort it may elect to take in regard to terminating ABA, to give ABA at least ninety days notice as required by R.S.Mo. § 407.405."

It is obvious that Coors' May 21, 1982 letter would change the status of the distributorship and therefore is in violation of this Court's December 7, 1981 order. It is also obvious that Coors sent its May 21, 1982 letter for the transparent purpose of seeking, once again, to terminate the Agreement without notice in an effort to avoid compliance with R.S.Mo. § 407.405 and the termination provisions of the Agreement, which, after service of a required notice, would permit ABA a short period of time within which it could sell the distributorship or, at the very least, to recoup some of its investment in the distributorship.

**39.** This Court convened the conference with counsel because it was encountering substantial difficulty in its effort to comply with the Court of Appeals' admonition that the merits of ABA's claim for equitable relief should be promptly tried after remand. In our September 3, 1980 memorandum opinion we stated our "strong feeling that both sides have already adduced all material and relevant evidence available to either side in regard to the quite narrow question of whether defendant's March 21, 1980 letter must be set aside as invalid." 496 F.Supp. at 1205. Order (2) entered that day directed that ABA's equitable claims be separated for separate trial pursuant to Rule 42(b) of the Rules of Civil Procedure and that all of ABA's separated equitable claims be "advanced for *immediate* trial on the merits pursuant to Rule 65(a)(2)." *Id.* 1205. (emphasis ours).

Coors, as was its right, elected to go to the Court of Appeals rather than go to trial on the merits of ABA's equitable claims, and thus avoided for the time being the question of whether it actually had any additional evidence to adduce in opposition to ABA's claim for permanent equitable relief than it had already adduced in connection with ABA's claim for temporary equitable relief. The stipulation eventually entered into by the parties shows that the feeling we expressed on September 3, 1980 was well founded.

We believe that the most recent controversy created by Coors' *ex parte* termination letter of May 21, 1982 should be considered and determined in a manner which will avoid further delay in the final determination of the basic question of whether Coors has any legal right under the factual circumstances and applicable Missouri law to terminate the Agreement without notice. We shall therefore focus on that portion of the prayer of ABA's June 4, 1982 motion which seeks an order "voiding [Coors] letter of May 21, 1982."

We believe, however, that it is also obvious that should this Court grant that portion of ABA's motion which would, at this time, set in motion a contempt proceeding, such an order could not help but delay the eventual final determination of the merits of ABA's equitable claims against Coors. We shall therefore enter an order which will grant only that portion of the prayer of ABA's pending motion which prays for an order "voiding the letter of May 21, 1982." The other portions of the prayer of ABA's motion will be denied without prejudice.

### VII. *Orders*

For the reasons stated, it is

ORDERED (1) that the portion of the prayer of ABA's pending June 4, 1982 motion which seeks an order voiding Coors' letter of May 21, 1982, should be and is hereby granted. The other portions of the prayer of that motion should be and are hereby denied without prejudice. It is further

ORDERED (2) that the Clerk, in accordance with Rule 58 of the Rules of Civil Procedure, shall enter judgment for the plaintiff ABA and against the defendant Coors, the same to be set forth on a separate document in a form that will state that:

It is ORDERED, ADJUDGED AND DECREED that under the findings of fact and conclusions of law stated in this Court's memorandum opinion filed this day, plaintiff ABA is entitled to a judgment in its favor and against defendant Coors. It is further

ORDERED, ADJUDGED, and DECREED that:

(1) Coors' attempt to terminate the Agreement without notice by its March 21, 1980 letter was invalid.

(2) Coors is permanently enjoined from further attempting to carry out the termination it unlawfully attempted in its March 21, 1980 letter.

(3) Coors' attempt to terminate the Agreement without notice by its May 21, 1982 letter was likewise invalid.

(4) Coors is permanently enjoined from further attempting to carry out the termination it unlawfully attempted in its May 21, 1982 letter.

(5) Coors is permanently enjoined from making any further attempt to terminate the Agreement without notice under the provisions of Paragraph II(1) of the Distributorship Agreement.

(6) It having been adjudged that Coors' attempts to terminate the Agreement without notice by its March 21, 1980 letter and by its May 21, 1982 letter are invalid, the Agreement between the parties should be and is hereby temporarily reinstated.

(7) Coors, in connection with any future effort which it may elect to attempt during the temporary reinstatement of the Agreement, is enjoined to proceed with a 90-day notice in accordance with R.S.Mo. § 407.405 and in accordance with either Paragraph XI(1) or Paragraph XI(2) of the Distributorship Agreement, and only those paragraphs of the Agreement.

(8) In any future effort that Coors may elect to take in regard to terminating, Coors shall give at least ninety (90) days notice as required by R.S.Mo. §§ 407.405 *et seq.* It is further

(9) ORDERED, ADJUDGED and DECREED that ABA is entitled to sell the distributorship pursuant to Paragraph VIII(i) of the Distributorship Agreement during the period of time that agreement is temporarily reinstated and the effective date of any termination which Coors may elect to serve notice under the provisions of either Paragraph IX(1) or Paragraph IX(2) of the Agreement.

(10) Coors may not unreasonably or arbitrarily withhold approval of a proposed sale of ABA's distributorship to a prospective buyer.

(11) In the event Coors elects to attempt to terminate ABA under either Paragraph IX(1) or Paragraph IX(2)

of the Agreement, both parties shall have the right to demand arbitration as provided in Paragraph VIII(2) and Paragraph XV of the Agreement.

APPENDIX

Section 1. As used in this act:

(1) The term "sale or distribution" includes the acts of leasing, renting or consigning;

(2) The term "goods" includes any personal property, real property, or any combination thereof;

(3) The term "other property" includes a franchise, license distributorship, or other similar right, privilege, or interest;

(4) The term "person" includes an individual corporation, trust, estate, partnership, unincorporated association, or any other legal or commercial entity; and

(5) The term "pyramid sales scheme" includes any plan or operation for the sale or distribution of goods, services or other property wherein a person for a consideration acquires the opportunity to receive a pecuniary benefit, which is not primarily contingent on the volume or quantity of goods, services, or other property sold or distributed or to be sold or distributed to persons for purposes of resale to consumers, and is based upon the inducement of additional persons, by himself of others, regardless of number, to participate in the same plan or operation;

(6) "Franchise" means a written *or oral* arrangement for a definite or indefinite period, in which a person grants to another person a license to use a trade name, trademark, service mark, or related characteristic, and in which there is a community of interest in the marketing of goods or services at wholesale, retail, by lease, agreement, or otherwise, *including but not limited to a commercial relationship of definite duration or continuing indefinite duration, between a "wholesaler", such wholesaler being a person as defined in this section, licensed under the provisions of Chapter 311 to sell at wholesale, spirituous liquor and wine containing alcohol in excess of 5 percent by weight to retailers, duly licensed in this state, and a "supplier", being a person engaged in the business as a manufacturer, distiller, rectifier or out-of-state solicitor whose brands of spirituous liquor and wine are distributed through duly licensed wholesalers in this state, and wherein a wholesaler is granted the right to offer, sell, and distribute within this state or any designated area thereof such of the supplier's brands of spirituous liquors and wines, or all of them, as may be specified*, except that, the term "franchise" shall not apply to persons engaged in sales from warehouses or like places of storage, *other than wholesalers as above-described*, leased departments of retail stores, places of original manufacture, nor shall the term franchise apply to a commercial relationship that does not contemplate the establishment or maintenance of a place of business within the State of Missouri. As used herein "place of business" means a fixed, geographical location at which goods, products or services are displayed or demonstrated for sale.

Section 2. 1. No person shall, directly or through the use of agents or intermediaries, in connection with the sale or distribution of goods, service, or other property, sell, offer or attempt to sell a participation or the right to participate in a pyramid sales scheme. No person who has granted a franchise to another person shall cancel or otherwise terminate any such franchise agreement without notifying such person of the cancellation, termination or failure to renew in writing at least ninety days in advance of the cancellation, termination or failure to renew, except that when criminal misconduct, fraud, abandonment, bankruptcy or insolvency of the franchisee, or the giving of a no account or insufficient funds check is the basis or grounds for cancellation or termination, the ninety days notice shall not be required.

Section 3. 1. Any contract made in violation of section 2 of this act is void and any person who, directly or through the use of agents or intermediaries, induces or causes another person to participate in a pyramid

sales scheme will be liable to that person in civil damages in an amount equal to the sum of twice the amount of consideration paid, and in the case of any successful action to enforce such liability, the costs of the action together with a reasonable attorney's fee, as determined by the court. An action under this section may be brought in the circuit court having venue within five years from the date on which the consideration was paid.

2. A franchisee suffering damage as a result of the failure to give notice as required of the cancellation or termination of a franchise, may institute legal proceedings under the provisions of this act against the franchiser who canceled or terminated his franchise in the circuit court for the circuit in which the franchisor or his agent resides or can be located. When the franchisee prevails in any such action in the circuit court, he may be awarded a recovery of damages sustained to include loss of goodwill, costs of the suit, and any equitable relief that the court deems proper.

Section 4. 1. *If more than one franchise for the same brand or brands of spirituous liquor and wines, or all of them, is granted to different wholesalers in this state, it is a violation of this act for any supplier to discriminate between the wholesalers with respect to any of the terms, provisions, and conditions of these franchises.*

2. *Notwithstanding the terms, provisions and conditions of any franchise, no supplier shall unilaterally terminate or refuse to continue or change substantially the condition of any franchise with the wholesaler unless the supplier has first established good cause for such termination, noncontinuance or change.*

3. *Any wholesaler may bring an action in a court of competent jurisdiction against a supplier for violation of any of the provisions of this section and may recover damages sustained by him together with the costs of the action and reasonable attorney's fees.*

4. *In any action brought by a wholesaler against a supplier for termination, noncontinuance or substantial change in violation of the provisions of this section, it is a complete defense for the supplier to prove that the termination, noncontinuance or change was done in good faith and for good cause.*

5. *As used in this section, "good faith" is the duty of each party to any franchise and all officers, employees or agents thereof to act in a fair and equitable manner towards each other, and "good cause" means either of the following:*

(1) *Failure by the wholesaler to comply substantially with the provisions of an agreement or understanding with the supplier, which provisions are both essential and reasonable; or*

(2) *Use of bad faith or failure to observe reasonable commercial standards of fair dealing in the trade.*

Section 5. In addition to other penalties and remedies provided in this act, whenever it appears that any person is engaged or is about to engage in any act or practice which constitutes a pyramid sales scheme, the attorney general may bring an action in the circuit court having venue to enjoin such act or practice, and upon a proper showing, a temporary restraining order or a preliminary or permanent injunction shall be granted without bond.

Section 6. Any person willfully violating any of the provisions of section 2 of this act is guilty of a felony and, upon conviction, shall be punished by a fine of not more than five thousand dollars or by imprisonment by the department of corrections for a term not to exceed five years, or both such fine and imprisonment.